IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02912-MSK-MEH

STANLEY CREWS,

      Plaintiff,

v.

SCHOOL DISTRICT NO. 1, IN THE CITY AND COUNTY OF DENVER, a/k/a Denver Public
Schools,
CLIFFORD PAINE,
MICHAEL EATON,
ROBERT SWAIN,
LISA WEHRLI, and
THOMAS CONROY,

      Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

**Michael E. Hegarty, United States Magistrate Judge**.

      Before the Court is a Motion to Dismiss Amended Complaint filed by Defendants School

District No. 1, City and County of Denver ("DPS"), Robert Swain, Lisa Wehrli and Thomas Conroy

[filed February 10, 2014; docket #29]. Pursuant to 28 U.S.C. § 636(b)(1)(B) and D.C. Colo. LCivR

72.1C, the matter is referred to this Court for recommendation [docket #30]. The motion is fully

briefed, and oral argument would not materially assist the Court in its adjudication. For the reasons

that follow, the Court respectfully RECOMMENDS that the Motion to Dismiss be **granted in part**

**and denied in part**.[1]

---

[1]Be advised that all parties shall have fourteen (14) days after service hereof to serve and file
any written objections in order to obtain reconsideration by the District Judge to whom this case is
assigned. Fed. R. Civ. P. 72(b). The party filing objections must specifically identify those findings
or recommendations to which the objections are being made. The District Court need not consider

## BACKGROUND

Plaintiff Stanley Crews ("Crews") initiated this action on October 24, 2013.  Docket #1.  Following service of process and an initial motion to dismiss, Plaintiff filed the operative Amended Complaint as a matter of course pursuant to Fed. R. Civ. P. 15(a).  *See* docket #22.

### I.      Facts

The following are factual allegations made by Crews in his Amended Complaint, which are taken as true for analysis under Fed. R. Civ. P. 12(b)(6) pursuant to *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Crews is an African-American male whose date of birth is February 5, 1957.  In May 1995, DPS hired Crews as an armed security patrol officer in its Department of Safety and Security (the "Department").  The Department regularly employs between 14 and 17 armed security patrol officers.  All armed patrol officers in the Department have the same job description and duties.  None are designated as a "senior" patrol officer in their job descriptions, the DPS Security Operations Manual or the organizational chart for the Department.  These armed patrol officers provide various security to all DPS schools, which includes, but is not limited to, response to dispatchers or supervisors and management to conduct investigations, challenge trespassers, apprehend persons suspected of criminal activity, respond to burglaries, and issue reports regarding

---

frivolous, conclusive or general objections.  A party's failure to file such written objections to proposed findings and recommendations contained in this report may bar the party from a de novo determination by the District Judge of the proposed findings and recommendations. *United States v. Raddatz*, 447 U.S. 667, 676-83 (1980); 28 U.S.C. § 636(b)(1).  Additionally, the failure to file written objections to the proposed findings and recommendations within fourteen (14) days after being served with a copy may bar the aggrieved party from appealing the factual findings of the Magistrate Judge that are accepted or adopted by the District Court. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991); *Niehaus v. Kansas Bar Ass'n*, 793 F.2d 1159, 1164 (10th Cir. 1986).

incidents occurring on DPS properties.

In or around 1998, Crews became aware of the fact that many African-American and Hispanic ("minority") patrol officers in the Department were subject to unfair terms, conditions, and privileges of employment. Many of these minority patrol officers suffered adverse employment actions including, but not limited to, the loss of designated shifts and vacation slots, and were subjected to unfair disciplinary actions, up to and including termination or forced resignation in lieu of termination. Caucasian recruits, who were brought in as patrol officers in the Department, were promoted ahead of minorities who had been with DPS longer.

In or around 1998, Crews became involved in trying to organize a union for the armed patrol officers in the Department, primarily for the perceived mistreatment of minority patrol officers in the Department. In response to Crews' union organization activities, his management initiated false accusations and disciplinary and/or corrective actions against Crews. Consequently, Crews contacted the DPS EEO Compliance Officer to address false accusations that management had made against him and to stop conduct related to Crews' union organization activity and the ongoing racial discrimination. The EEO Officer mediated an agreement that led to the temporary cessation of adverse actions against Crews in exchange for Crews ceasing any further union organization activity.

However, Crews continued to see discriminatory treatment against minority patrol officers and, over the years, voiced his concerns. Such treatment included discipline, termination or forced resignation of other African-American employees including but not limited to, Jonathon Ervin, Adrian Morris, Greg Porter, Bill Carter, Mike Hicks, Lawrence McFadden, Rodney Masey, Tom Cole, Ron Bush, Don Lane, Kevin Edwards, Jim Williams, Brian Wilson, Velma Underwood and,

ultimately, Stanley Crews.  The treatment also included the discipline, termination or forced resignation of Hispanic employees including but not limited to, John Deaguero, Monica Trujillo, Sandra B. and Robert Maldonado.

In response to Crews' ongoing complaints, management again created false disciplinary warnings against Crews involving conduct for which others outside his protected category were not disciplined. In spite of the alleged disciplinary actions, Crews received favorable performance evaluations throughout his career.  From 2003 forward, Crews regularly worked the third-shift or graveyard shift.  Starting sometime in 2005, DPS began utilizing the Department of Transportation and Support Services Professional/Technical Performance Evaluation form (the "Evaluation Form") to evaluate armed patrol officers in the Department.  Scores of 3.6 and 3.7 are "Superior" on the Evaluation Form.

Crews' supervisors did not consistently provide him with an annual evaluation.  On July 21, 2006, DPS ranked Crews as a 3.7 on the Evaluation Form for the evaluation period of July 21, 2005 through July 21, 2006.  On January 6, 2009, DPS ranked Crews as a 3.6 on the Evaluation Form for the evaluation period of July 21, 2006 through December 31, 2008.

In or about November 2009, Defendant Paine began actively serving as one of the Operations Sergeants in the Department and became Crews' administrative Operations Sergeant, such that Crews began reporting directly to Paine.  Prior to that time, Defendant Wehrli was Crews' administrative Operations Sergeant.  Shortly after Paine became the Operations Sergeant, he began to single out Crews for various alleged work infractions.

The Department's custom and culture with respect to minorities included, but was not limited to: derogatory name calling; excessive drug testing; disparate treatment for gun infractions;

4

conspiracy against minorities; substandard uniform items given to replace old worn out uniforms; reports held to a different standard; vacations turned down without reason; significant delays in processing FMLA requests after initial approval; violations of sick and late policies; forced viewing of a derogatory movie, "Dead Homies"; a five- to six-year time frame during which no African-Americans were hired or promoted in the patrol officer division; and when minorities attempted to file a grievance, they were terminated, or the grievance was not investigated.

From February to April 2011, Paine constantly sent Crews' reports back to Crews to make minor changes. Paine did not send reports back to non-African-American patrol officers for the same types of minor changes. Prior to Paine's arrival, Crews never had an issue with his reports while serving under Wehrli. In addition, Paine required Crews and another African American patrol officer, Lawrence McFadden ("McFadden"), to establish and utilize email receipts on Crews' and McFadden's work email accounts. Paine did not require non-African-American patrol officers to establish and utilize email receipts. Paine deleted reports that Crews submitted via the incident report system, but did not take similar actions against non-African-American patrol officers. Frequently, when Crews reported for graveyard shift, Paine would stand near the entrance of the patrol officers' office, looking at his watch as Crews reported for work. Paine did not impose this level of scrutiny to non-African American or non-Hispanic employees.

On September 27, 2010, Crews was rated as "effective" (3.1) on the Evaluation Form for the evaluation period of November 11, 2009 through July 31, 2010. After Paine began supervising him, Crews was given unwarranted disciplinary actions and was able to establish that the stated reasons for which Paine disciplined him were false. In or about April 2011, Crews met with Defendant Swain, Commander of the Operations Division, to address his concerns regarding Paine's treatment.

Swain told Crews that he would speak to Paine.  After Crews talked to Swain, the situation between Crews and Paine got worse.

In June 2011, Crews called the "HR Connect" phone line to inquire about information concerning DPS's grievance process.  On June 20, 2011, Lee J. Renfrow ("Renfrow"), Defendant's Human Resources Director, sent Crews an email about the grievance process and invited Crews to contact him if he could be of further assistance.  Crews replied informing Renfrow that he wanted to meet with him at his earliest convenience to discuss concerns with supervisors and working in a hostile work environment.  Renfrow set up a face-to-face meeting with Crews at which Crews stated that he wanted to formally lodge a grievance concerning the fact that Paine was singling out Crews.  Crews also told Renfrow that he suspected Paine was attempting to manufacture false proof that Crews was not compliant with the submission of his reports, to potentially issue unwarranted discipline and, possibly, to terminate him.  Crews also told Renfrow that he felt he and other older patrol officers were suffering discrimination, and that he suspected management was trying to force Crews and other older patrol officers out.

On July 6, 2011, Renfrow emailed Crews, stating that he would investigate Crews' "concerns."  On July 26, 2011, Crews met with Defendant Eaton, the new Chief of Security, and Swain.  Crews informed Eaton and Swain of many of the issues on which he wished to base a grievance against Paine, and Crews further expressed his concern that Paine was singling out the minority patrol officers in the Department.  In addition, Crews told Eaton and Swain that he felt he was being subjected to a hostile work environment based on his race, and that he believed Paine was trying to find a way to fire him.  Further, Crews told Eaton that in the past none of the minority patrol officers were made aware of the opportunity to apply for field training officer opportunities.

6

Eaton told Crews, "I will tell you right now, we are looking forward not backwards."  Swain told Crews he would talk to Paine.  After Crews spoke with Eaton and Swain, the situation with Paine worsened.

An investigation into Crews' complaints was opened.  Defendant Conroy was the investigator allegedly handling the investigation.  On or about August 24, 2011, Crews was selected for an alleged "random" drug test.  No paperwork was provided to Crews concerning the alleged random drug test.  Crews passed the drug test.

On or about September 6, 2011, Renfrow met with Crews at which Renfrow told Crews he could not locate Crews' witness, Lawrence McFadden.  Renfrow said he would keep looking into Crews' complaints and trying to locate McFadden.

On or about September 9, 2011, Crews received an email regarding his selection for a second alleged "random" drug test.  Crews passed the second drug test.  On or about January 3, 2011,[2] Crews received a notice for a third alleged random drug test.  Crews passed the third drug test.  In the seventeen years during which Crews worked for DPS, he had been randomly selected for a drug test only a handful of times.

It is statistically impossible for Crews to be "randomly" selected for a drug test three times in the span of three months.  Supervisors have the discretion not to require a drug test if the "random" selection targets an individual who was previously tested close in time to the new test.  Crews actually was not selected randomly but was targeted by Paine or Paine failed to exercise discretion in subjecting Crews to additional drug tests in an attempt to find and/or manufacture a

---

[2]The context of the factual allegations leads the Court to believe that this date contains a typographical error; the date should be January 3, 2012.

reason to terminate him.

On January 24, 2012, Crews worked his regularly scheduled graveyard shift. The other patrol officer on duty that night was Officer Alex Two-Elk ("Two-Elk"). Pursuant to DPS policy, at 00:47 hours on January 24, 2012, dispatcher Robert Maldonado ("Maldonado") notified Crews and Two-Elk of a burglary at Wyman Elementary School. Maldonado is Hispanic.

According to established procedures, the patrol officer who arrives first on the scene of a burglary becomes the primary responding patrol officer in control of that crime scene, and the patrol officer who is the second to arrive is the secondary responding patrol officer. The Primary Officer is responsible for completing a primary incident report concerning the burglary during the same shift in which he or she responded to the burglary. The Secondary Officer is responsible for completing a supplemental incident report concerning the burglary no later than the end of the shift on the next workday. This has been the dispatch and burglary response procedure for the last 12 years during which Crews worked at the Department.

At the time Maldonado notified Crews of the Wyman Elementary burglary, Crews was stuck in road construction traffic on Interstate 70. Crews notified Maldonado that he was stuck in traffic and in a detour. Two-Elk was the first patrol officer to arrive at Wyman Elementary. As such, according to DPS policy, Two-Elk became the Primary Officer for the burglary. Due to the construction traffic, Crews arrived at Wyman Elementary approximately 25 minutes after Two-Elks and, according to DPS policy, became the Secondary Officer for the burglary.

Pursuant to the Department's protocol, Crews secured a position on the southeast corner of Wyman Elementary. Upon Crews' arrival, Two-Elk had already initiated the investigation in conjunction with the Denver Police Department (DPD), and they held  their respective positions

8

while awaiting arrival of the DPD K-9 unit.  After DPD officers inspected Wyman Elementary and found broken windows but no suspects, Two-Elk called dispatcher Maldonado, who subsequently called the Person of Contact after-hour custodian to come to Wyman Elementary to fix the broken windows, per protocol.  Two-Elk remained at Wyman Elementary while waiting for the Person of Contact to arrive.  Dispatch called Crews to another burglary alarm at Edison Elementary to which he immediately responded.

Two-Elk was able to access the new ARMS reporting system through the secured location at Wyman Elementary and submitted his completed primary report at 05:37 hours.  Crews attempted to submit his supplemental report for the Wyman Elementary burglary incident before finishing his shift on January 25, 2011,[3] but Crews encountered trouble logging on to the ARMS reporting system while in the field as he ended his shift.

Pursuant to DPS policies, a memorandum was issued stating that patrol officers may turn in supplemental reports the shift after an incident, if needed, to avoid incurring overtime pay.  Crews timely submitted his supplemental report on January 25, 2013[4] at 08:13 hours.  Crews' report was appropriately and timely submitted pursuant to all relevant DPS guidelines, policies and/or procedures.

The day following the Wyman Elementary incident, Paine sent an email to Swain, Wehrli, Eaton and Conroy at 9:11 a.m. stating that "because of the confusion of this case as to who the Primary officer was and the fact that the report could not be entered only supplemental reports could

---

[3]The context of the factual allegations leads the Court to believe that this date contains a typographical error; the date should be January 25, 2012.

[4]The context of the factual allegations leads the Court to believe that this date contains a typographical error; the date should be January 25, 2012.

be completed I correct the initial report to reflect DPS51 (TwoElk) as the primary and removed DPS41 (Crews) to back up in order to clean this case up. Because of the ongoing investigation I wanted you all to be aware. The case has been corrected and we should be good now." Eaton responded, "Thanks Cliff, Please keep this email in the event we need to refer to it later referencing any action that is taken with certain individuals."

The "certain individual" referenced in the email was Crews, and the action to be taken was Crews' termination. Paine's stated intent to "clean this case up" was an attempt to cover up a discriminatory and/or retaliatory motive for terminating Crews after he complained of discrimination. Paine falsely stated that Crews was the "primary officer" responsible for the call. In his final log entry in the ARMS computer system, Maldonado designated TwoElk as the Primary Officer because he arrived on the scene prior to Crews and took command of the investigation. On January 24, 2012, Paine ordered Maldonado to change his final log entry changing Crews from Back Up Officer to Primary Officer and TwoElk from Primary Officer to Back Up Officer in the ARMS computer system. Paine ordered Maldonado to falsify the report to justify terminating Crews. On January 25, 2012, Paine sent a memorandum to Swain recommending that Crews be terminated.

On January 31, 2013[5] Eaton signed the paperwork terminating Crews' employment for violating Safety and Security Policy 2.11. The termination paper falsely states that Crews was the primary officer and considered the "senior/ranking member in command of the incident." Crews' letter of termination also states that "[a]t some point during the incident, you relinquished your responsibilities to an officer with much less experience than you without proper authorization. This

_____

[5]The context of the factual allegations leads the Court to believe that this date contains a typographical error; the date should be January 31, 2012.

action resulted in the documentation of this incident being significantly delayed and not completed as required by department policy."

Maldonado was also terminated on January 31, 2013.[6]

Similarly situated non-African-American and non-Hispanic employees were not disciplined when they were designated as secondary officer including, but not limited to, Joel Dann, Albert Elio, Tim Gallegos, John Linger, Keith Myers, Shawn Schrivner and Bill Valdez.

Contrary to Crew's letter of termination, Maldonado's letter of termination attributes fault to Maldonado stating that "at some point Officer Alex Two-Elk was assigned as the primary officer but no notation was made on the radio or in the ARMS Computer Aided Dispatch System. As a result, proper documentation of command assigned was not established for a high risk emergency situation, and field officers were not able to complete the required incident report due to your failure to document accordingly."

Crews followed the Department standard operating procedure for graveyard shift on many occasions, including as recently as December 4, 2011, when Crews was secondary officer for a burglary, arriving 20 minutes after primary officer Baccarella initiated the investigation.  Crews was not disciplined in any way for the December 2011 situation in which he provided backup to the primary patrol officer on the scene.

Other non-African-American patrol officers have acted as a back-up officer when they arrived second on the scene even though the officer arriving first on the scene had less seniority. No non-African-American patrol officers in the Department were reprimanded, suspended, or

---

[6]The context of the factual allegations leads the Court to believe that this date contains a typographical error; the date should be January 31, 2012.

terminated for allegedly not following Policy 2.11 in commanding a routine crime scene.

Policy 2.11 has never been used at DPS to determine who takes command of an investigation. It has always been the Department's protocol and practice that the first officer to arrive on the scene became the Primary Officer to the incident.

## II.    Procedural History

Based on these allegations, Crews filed the operative Amended Complaint, alleging generally that Defendant DPS discriminated against him based on his age and race (first and second claims) and retaliated against him for complaining about such discrimination (third claim);Defendant DPS violated the Fourteenth Amendment's equal protection clause and 42 U.S.C. § 1981 (fourth claim); the individual Defendants violated the Fourteenth Amendment's equal protection clause and 42 U.S.C. § 1981 (fifth claim); and Defendant DPS should be estopped for terminating Plaintiff in violation of the promises made in the Department's manual and protocol (sixth claim).

In response to the Amended Complaint, Defendants filed the present motion to dismiss Plaintiff's fourth, fifth and six claims.  For the fourth claim, Defendants contend that Plaintiff fails to allege sufficient facts demonstrating DPS's alleged actions were taken pursuant to a district policy or custom, or by a final decisionmaker for the district.  For the fifth claim, the individual Defendants argue that they are entitled to qualified immunity because Plaintiff fails to allege sufficient facts demonstrating they violated a constitutional right that was clearly established at the time of the violation.  For the sixth claim against DPS, Defendants argue that Plaintiff fails to allege sufficient facts showing that DPS breached a promise, that he reasonably relied on a promise to his detriment and that the promise must be enforced to prevent injustice; further, Plaintiff fails to allege that any promise was made by someone with authority to bind the district to such promise.

Plaintiff counters that Defendants have misstated the elements of a *prima facie* case under 42 U.S.C. §§ 1981 and 1983 against DPS and that Defendants do not dispute three of the four elements regarding Plaintiff's termination of employment.  With respect to the fourth element – DPS officials acted pursuant to a custom or policy of discriminatory employment practices – Plaintiff contends that paragraphs 16 through 30 of his Amended Complaint state facts sufficient to demonstrate the fourth element.  Plaintiff also argues that he states sufficient facts supporting plausible claims under 42 U.S.C. §§ 1981 and 1983 against the individual Defendants (Conroy, Wehrli and Swain), in that they "received the email from Paine informing them he had altered the primary officer's initial report and all three knew or should have known that it was against DPS policies to alter an investigative report."  Finally, Plaintiff asserts he sufficiently alleges facts supporting a promissory estoppel claim, and the Defendants improperly ask the Court to infer that their version of the facts are true.

Defendants reply that Plaintiff conceded their argument that Plaintiff failed to plead facts showing that the alleged action was taken by a final policymaker for the district; rather, Plaintiff argues only that the violation was taken pursuant to an official custom of the district.  Defendants contend that Plaintiff's allegations merely challenge a policy of a single department in the district as opposed to a "widespread" and "well settled" policy of discrimination in the entire district. Defendants also argue that Conroy, Wehrli and Swain are entitled to qualified immunity as to the Sections 1981 and 1983 claims since Plaintiff fails to plead that these Defendants had a duty to take any action in response to Paine's email regarding the altered report.  Further, Defendants state the email was also sent to their supervisor, Chief Michael Eaton; thus, Defendants knew that their supervisor had been informed of the report.  Moreover, Defendants contend there is no law that

would put Defendants on notice that receiving an email containing information that a co-worker violated department policy and, thus, qualified immunity is proper.  Finally, Defendants assert that Plaintiff fails to allege sufficient facts for his promissory estoppel claim, arguing that the facts do not demonstrate violations of Operations Manual §§ 2.29 and 2.34 and that any "revised guidelines" or "practice and protocol" were not promises made by DPS.

The Court has reviewed the operative pleading, the motion, the briefs and the applicable law, and is sufficiently advised for the following recommendation.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Plausibility, in the context of a motion to dismiss, means that the plaintiff pled facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.  Twombly* requires a two-prong analysis. First, a court must identify "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Id.* at 678-80.  Second, the Court must consider the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681.  If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id.* at 680.

Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008)).

"The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011). Thus, while the Rule 12(b)(6) standard does not require that a plaintiff establish a prima facie case in a complaint, the elements of each alleged cause of action may help to determine whether the plaintiff has set forth a plausible claim. *Khalik*, 671 F.3d at 1191.

## ANALYSIS

Defendants argue that Crews fails to state claims for violations of the Equal Protection clause and 42 U.S.C. § 1981 and for promissory estoppel. Keeping the applicable legal standards in mind, the Court will analyze each of these claims in turn.

## I.      42 U.S.C. §§ 1981 and 1983

"In racial discrimination suits, the elements of a plaintiff's case are the same whether that case is brought under §§ 1981 or 1983 or Title VII." *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008) (citing *Baca v. Sklar*, 398 F.3d 1210, 1218 n. 3 (10th Cir. 2005)). To prevail, the Plaintiff must establish intentional discrimination through either direct or indirect evidence. *Id.*

> If there is no direct evidence of discrimination, the [*McDonnell Douglas*] burden-shifting framework is used to indirectly prove intentional discrimination. Pursuant to the *McDonnell Douglas* approach, if a plaintiff can make out a prima facie case of discrimination, the burden shifts to the defendant to demonstrate a legitimate non-discriminatory reason for the adverse employment action. If the defendant meets this burden, the burden shifts back to the plaintiff to demonstrate that the defendant's proffered reason is pretext.

*Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005) (citations omitted). Here, Defendants contend that Plaintiff fails to allege sufficient facts demonstrating a *prima facie* case.

"To make out a prima facie case of discrimination, [Plaintiff] must demonstrate (1)

membership in a protected class, (2) adverse employment action, and (3) disparate treatment among similarly situated employees." *Id.* Also, for municipal liability to arise under Sections 1981 and 1983, Plaintiff must demonstrate that the Defendants' officials acted pursuant to a "custom or policy" of "discriminatory employment practices." *Carney*, 534 F.3d at 1273 (quoting *Randle v. City of Aurora*, 69 F.3d 441, 446 n. 6, 447 (10th Cir. 1995)).

A.    Claims against DPS

Here, Defendants argue that Plaintiff's allegations do not identify any final policymaker responsible for the alleged violations but, rather, challenge a discriminatory "custom" of merely a single department as opposed to the entire district, which is required for municipal liability. Plaintiff counters that paragraphs 16 through 30 of his Amended Complaint demonstrate DPS officials acted pursuant to a custom or policy of discriminatory employment practices, which is all that is necessary to state plausible Sections 1981 and 1983 claims.

"Plaintiffs seeking to impose liability on a municipality under section 1983 must identify a municipal 'policy' or 'custom' causing their injury." *Marshall v. Columbia Lea Reg. Hosp.*, 345 F.3d 1157, 1177 (10th Cir. 2003) (citing *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997)). "An unconstitutional deprivation is caused by a municipal 'policy' if it results from decisions of a duly constituted legislative body or an official whose acts may fairly be said to be those of the municipality itself." *Id.*

"Similarly, 'custom' has come to mean an act that, although not formally approved by an appropriate decision maker, has such widespread practice as to have the force of law." *Id.* "Governmental entities may be held liable for a 'longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity.'" *Randle*, 69 F.3d at 446 (citing

16

*Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 736 (1989)); *see also Melton v. City of Okla. City*, 879 F.2d 706, 725 n. 26 (10th Cir. 1989) (distinguishing case from [*City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988)] because plaintiff offered evidence that the City acted similarly against another person in addition to himself, and thus, was potentially able to demonstrate the existence of a custom), *modified on other grounds*, 928 F.2d 920, 922 (10th Cir.) (en banc) (explicitly leaving panel's judgment on § 1983 liability intact), *cert. denied*, 502 U.S. 906 (1991).

Here, the Court agrees first that Plaintiff fails to allege Defendants' actions were taken pursuant to an official written DPS policy or by a final policymaker for DPS. *See* Amended Complaint, ¶ 126, docket #22 at15 ("The Department's treatment of African American and Hispanic employees ... establish a custom of continuing, persistent and widespread discrimination against African American and Hispanic employees."). Rather, Plaintiff alleges specifically that Paine and Eaton, in their official capacities, acted pursuant to a policy or custom of the DPS in discriminating against African-American and Hispanic employees. *Id.*, ¶ 167, docket #22 at19-20.

Defendants rely on an unpublished case from the Northern District of Illinois for their proposition that Plaintiff must allege sufficient facts demonstrating a custom of discrimination across the entire district, rather than just one department. *See* Reply, docket #35 at 3 (citing *Gage v. Metro. Water Reclamation Dist. of Greater Chicago*, No 02 C 9369, 2004 WL 1899902, at *15 (N.D. Ill. 2004)). Of course, the unpublished opinion is not binding on this Court, nor does the Court find it persuasive for a Rule 12(b)(6) analysis, considering that the opinion is a ruling on a Rule 56 motion. *Id.* Moreover, the *Gage* court found that the plaintiff's evidence demonstrated merely that the "low-level" supervisor who terminated the plaintiff's employment also terminated only one other minority (non-African-American) employee. *Id.*

17

Finally, the Court finds that the *Gage* decision may be in contravention of the Tenth Circuit's opinion in *Melton*, insofar as Melton was an officer with the city's police department and plausibly alleged his termination by the chief of police and city manager was taken pursuant to municipal policy by a final policymaker. *Melton*, 879 F.2d at 725. The Tenth Circuit noted that the evidence from that case suggested the forced retirement of another police officer similarly situated to the plaintiff may have demonstrated a "pattern or practice of subjecting individuals to retaliatory action" which "might [ ] be sufficient to show the existence of an unconstitutional municipal policy giving rise to Section 1983 liability." *Id.* at 725 n.26. The court distinguished *Melton* from the Supreme Court's opinion in *Praprotnik* saying "[that] plaintiff had never 'attempt[ed] to prove that such retaliation was ever directed against anyone other than himself.'" *Id.* (citing *Praprotnik*, 485 U.S. at 125). Accordingly, to the extent that *Gage* requires a plaintiff to allege a municipal custom by demonstrating incidents that occurred throughout the entire municipality, rather than in a single department of the municipality, the Court finds such requirement directly contrary to the Tenth Circuit's direction in *Melton*.

In this case, Plaintiff (African American) alleges that Paine, his supervisor, and Eaton, Chief of Security, terminated him and the dispatcher, Maldonado (Hispanic), for violations for which no non-minority DPS employee has been, or would be, terminated. Amended Complaint, ¶¶ 117-125. Further, Plaintiff alleges that he and other minority officers observed and experienced disparate treatment from approximately 1998 (after which the Plaintiff attempted to organize a union due to such "mistreatment") to the time of Plaintiff's termination in 2012. *Id.*, ¶¶ 16-23, 126-134. Plaintiff identifies 14 African-American officers during that time who experienced "discipline, termination or forced resignation" due to alleged discrimination. *Id.*, ¶ 25.

In accordance with the Tenth Circuit's opinions in *Marshall*, *Randall*, and *Melton*, the Court finds that Plaintiff has sufficiently alleged a plausible claim against DPS for Paine's and Eaton's conduct taken pursuant to an official policy or custom of discrimination. Thus, the Court recommends that the District Court deny Defendant's motion to dismiss Plaintiff's Fourth Claim for Relief.

B.    Claims against Swain, Conroy and Wehrli

Defendants argue that these individual Defendants are entitled to qualified immunity for Plaintiff's failure to allege plausible violations of the equal protection clause and failure to allege Defendants were on notice by clearly established law of such violations. Plaintiff counters that these Defendants knew the right to be free of race discrimination was clearly established in 2011-12 and that the Defendants knew Paine had improperly altered a security report leading to Plaintiff's termination, but did nothing in response and, thus, acquiesced in or condoned the alleged discriminatory behavior.

Qualified immunity protects from litigation a public official whose possible violation of a plaintiff's civil rights was not clearly a violation at the time of the official's actions. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "It is an entitlement not to stand trial or face the other burdens of litigation." *Ahmad v. Furlong*, 435 F.3d 1196, 1198 (10th Cir. 2006) (internal quotations and citations omitted). "The privilege is an immunity from suit rather than a mere defense to liability." *Id.*

Qualified immunity is designed to shield public officials and ensure "that erroneous suits do not even go to trial." *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 779 (10th Cir. 1993) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *Harlow*, 457 U.S. at 806-08 (1982); *Pueblo*

19

*Neighborhood Health Ctrs. v. Losavio*, 847 F.2d 642, 645 (10th Cir. 1988)).  Consequently, courts should address the qualified immunity defense at the earliest possible stage in litigation.  *Medina v. Cram*, 252 F.3d 1124, 1127-28 (10th Cir. 2001); *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995).

When a defendant asserts the defense of qualified immunity, the burden shifts to the plaintiff to overcome the asserted immunity.  *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009). "The plaintiff must demonstrate on the facts alleged both that the defendant violated his constitutional or statutory rights, and that the right was clearly established at the time of the alleged unlawful activity."  *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 818 (2009)).

The Supreme Court has discarded a review process that required courts to examine these questions sequentially, first considering whether a right had been violated, and then second – if the court concluded a right had been violated – whether that right was clearly established at the time of the alleged violation.  *Pearson*, 555 U.S. at 232-35.  *Pearson* instead affords courts the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Id.* at 236; *see also Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1277 (10th Cir. 2009).[7]

Here, the Plaintiff does not dispute and the Court agrees that the doctrine of qualified immunity applies to Plaintiff's Sections 1981 and 1983 claims against the individual Defendants. The Court finds it prudent to begin with an analysis as to whether the law was clearly established at the time of the alleged violations.  Defendants argue that "being a recipient of an email by Sgt.

---

[7]The Defendants incorrectly cite to case law overturned by *Pearson* on this issue.  Motion, docket #29 at 6-7.

Paine" was not clearly established law prohibiting race discrimination at the time they received it. Motion, docket #29-1 at 7-9.   Plaintiff counters that "the right to be free from race-based discrimination was clearly established law at the time of the alleged violations."  Response, docket #31 at 6.

The Court finds that the parties misstate – Plaintiff too broadly and Defendants too narrowly – the law that must be demonstrated to be clearly established in this case pursuant to the qualified immunity doctrine.  "It is the plaintiff's burden to prove that the law on which he relies was clearly established at the time of the events underlying his suit."  *Kingsford v. Salt Lake City Sch. Dist.*, 247 F.3d 1123, 1132 (10th Cir. 2001).  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Cordova v. Aragon*, 569 F.3d 1183, 1192 (10th Cir. 2009), *cert. denied*, 558 U.S. 1152 (2010).  "Although a plaintiff need not demonstrate that the specific action in question has previously been held unlawful, the right allegedly violated must be sufficiently clear so that a reasonable official could understand that his conduct violated that right." *Kingsford*, 247 F.3d at 1132.  "This is generally accomplished when there is controlling authority on point or when the clearly established weight of authority from other courts supports plaintiff's interpretation of the law."  *Greene v. Barrett*, 174 F.3d 1136, 1142 (10th Cir. 1999).

Based on Plaintiff's allegations in this case, the Court finds that the "law" necessary to be clearly established at the time of the individuals' alleged conduct is stated by Plaintiff in his Amended Complaint:

176.    Paine sent an e-mail to Defendants Swain, Wehrli, Eaton and Conroy informing them that "only supplemental reports could be completed" and that he had

altered the primary officer's initial report acknowledging the "confusion" of who was the primary officer during the incident that lead to Plaintiff's termination.

177.    The recipients of Paine's e-mail were knew or should have known that it was against DPS policy for Paine to alter the investigative report(s) surrounding Plaintiff's termination.

178.    Swain, Wehrli, Eaton and Conroy condoned and acquiesced to Paine's unlawful alteration of the primary officer's report to support the unlawful termination.

179.    Paine further informed Swain, Wehrli, Eaton and Conroy that he had to "clean this case up" . . . "because of the ongoing investigation."

180.    A reasonable officer confronted with evidence that an investigative report had been materially altered would not have condoned or acquiesced to the alternation [sic].

181.    Plaintiff's unlawful termination was a direct and foreseeable consequence of the altered report and the actions of the recipients in not reporting the alteration (which ultimately was used to support Plaintiff's termination) violated Plaintiff's clearly established constitutional right to be treated the same as others outside his race.

Amended Complaint, docket #22 at 21.  In other words, Plaintiff asserts that Swain, Conroy and Wehrli engaged in race discrimination when they acquiesced in or condoned an action that led to the Plaintiff's termination.

When discussing whether there was acquiescence in an action or whether an action was condoned, the Supreme Court and Tenth Circuit typically analyze whether a supervisor has done so, primarily because supervisors and managers likely have a duty to respond to or report improper conduct and because supervisors' and managers' actions may be imputed to the employer. *See, e.g., Iqbal*, 556 U.S. at 677; *Lewis v. Tripp*, 604 F.3d 1221, 1227 n.3 (10th Cir. 2010).  In this case, Wehrli was Plaintiff's ***former*** supervisor (more than two years previously) at the time she received the email, Swain was the Commander of the Operations Division, and Conroy was the investigator

of Plaintiff's discrimination complaint.  Clearly, among these Defendants, Swain is the only person who might be considered Plaintiff's supervisor at the time of the email.

The Tenth Circuit has "said that a plaintiff cannot establish liability under § 1983 merely by showing that the defendant was in charge of others who may have committed a constitutional violation. Instead, the plaintiff must establish a 'deliberate, intentional act by the supervisor to violate constitutional rights.'" *Phillips v. Tiona*, 508 F. App'x 737, 744 (10th Cir. 2013) (quoting *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010)).  "A supervisor's mere knowledge of his subordinate's discriminatory purpose and acquiescence are insufficient to establish a constitutional violation." *Id.* (citing *Iqbal*, 556 U.S. at 677).  Accordingly, because a supervisor's acquiescence is not a constitutional violation, such conduct certainly is not "clearly established" for purposes of the qualified immunity doctrine.  Plaintiff has failed to allege facts demonstrating Swain violated his rights under Sections 1981 and 1983 that were clearly established at the time.

As for Conroy and Wehrli, the Plaintiff must show that their actions in "acquiescing in or condoning" Paine's alteration of the investigative report allege a plausible claim.  Plaintiff does not allege that either of these individuals had any supervisory authority over him or a duty to report improper alterations of an investigation report.  *See, e.g., Murrell v. Sch. Dist. No. 1, City of Denver, Colo.*, 186 F.3d 1238, 1251 (10th Cir. 1999) (plaintiff properly alleged that the school principal and teachers ***who had supervisory authority over the student harasser*** met the student's harassment with deliberate indifference) (emphasis added).  The Plaintiff identifies no Tenth Circuit or Supreme Court case holding that municipal employees, other than supervisors or managers, may violate the Constitution or federal statutes by condoning or acquiescing in another employee's discriminatory conduct, and the Court has found none.  Thus, Plaintiff has failed to allege facts demonstrating

23

Conroy and Wehrli violated his rights under Sections 1981 and 1983 that were clearly established at the time.

Accordingly, this Court recommends that the District Court find Plaintiff has failed to state plausible claims against Defendants Conroy, Wehrli and Swain for violations of 42 U.S.C. §§ 1981 and 1983, and grant these Defendants' motion to dismiss Plaintiff's fifth claim for relief against them.

## III.   Promissory Estoppel

Plaintiff alleges that DPS made promises to him in the forms of the DPS Security Operations Manual and associated protocol on which he relied to his detriment.  Specifically, Plaintiff asserts:

191.   Section 2.29 of the manual states "[n]o member shall [ ] cause to be reported any act or omission or false accusation, either criminal or civil in nature, that they believe to be untrue or unsubstantiated that would mislead or cover-up actual facts."

192.   Paine, in altering the report, covered up actual facts or misled those involved in the termination to support Crews' termination. Recipients of Paine's e-mail as described above knew of Paine's alteration of the report.

193.   Section 2.34 of the manual states, "[m]embers shall always maintain the strictest honesty in their official duties and shall not embellish, fabricate or otherwise be untruthful in any fashion. Members shall always speak truthfully to supervisors regarding official actions taken and during any official investigation or inquiry."

194.   In addition, on or about March 02, 2009 the Department revised the guidelines for the completion and submission of reports taken by field personnel permitting field personnel like Plaintiff to complete a report the day after his or her shift. Such revision amounted to a promise that Crews was entitled to rely on in submitting his supplemental report.

195.   Moreover, the practice and protocol established by the Department has always been that the first officer to arrive on the scene became the primary officer to the incident regardless of seniority.

196.   Crews justifiably relied on these promises in carrying out the essential functions of his job.

197.     Crews relied on these promises to his detriment.

Amended Complaint, docket #22 at 23-24.  Accordingly, Plaintiff identifies the following promises by DPS on which he relied to his detriment: (1) officers must be honest in their reports; (2) Plaintiff was entitled to complete his investigation report the day after his shift; and (3) the first officer to arrive on the scene became the primary officer regardless of seniority.  Plaintiff alleges that DPS's termination of his employment violated these promises.

Defendants assert that the email on which Plaintiff relies for his claim that DPS violated the "false reporting" and "honesty" provisions of the operations manual reveals that Paine truthfully revealed to his managers that he "corrected" the subject report and how he did it; thus, Plaintiff cannot show any violations of promises made in the operations manual.  Further, Defendants contend that the operations manual contains no "guidelines" on which Plaintiff relies for the second promise and that, instead, the manual provides officers should, by the end of a day or shift, submit reports for processing.  Finally, Defendants argue that the practice and protocol on which Plaintiff relies for his third promise is not contained in the manual but, rather, the manual provides that the senior ranking officer should take command once that officer arrives on scene.  Defendants state that Plaintiff fails to allege facts demonstrating the guidelines or protocols were made by anyone with power to bind DPS.

Plaintiff responds construing Defendants' motion as an improper attempt pursuant to Rule 12(b)(6) to ask this Court to infer that their version of the facts is true.  Plaintiff contends that Defendants' arguments rely improperly on evidence outside of the pleadings and asks that, to the extent the Court considers Defendants' evidence, it must also consider the affidavits Plaintiff attaches rebutting Defendants' arguments.

Defendants reply that, taking them as true, the allegations Plaintiff makes regarding the email demonstrate that Paine did not cover up anything nor did he make a false report; thus, Plaintiff has not demonstrated that Paine breached a promise made by the operations manual.   Further, Defendants assert that Plaintiff fails to identify any official with authority to bind the district, who allegedly promulgated the "revised guidelines" and "practice and protocol."   Defendants also argue that the Court may consider the operations manual as evidence under Rule 12(b)(6) because it was referred to in the Complaint and is central to Plaintiff's promissory estoppel claim.

Under Article III of the United States Constitution, a federal district court can exercise jurisdiction over state claims appended to a federal claim if (1) the federal claim is of sufficient substance to confer federal jurisdiction; and (2) the federal and state claims arise out of a "common nucleus of operative fact [which the plaintiff] would ordinarily be expected to try ... in one judicial proceeding ...."   *United Mine Workers v. Gibbs*, 388 U.S. 715, 725 (1966). If a federal claim is dismissed before trial, the district court ordinarily should decline to exercise supplemental jurisdiction over the pendent state claim.   *Brooks v. Gaenzle*, 614 F.3d 1213, 1229 (10th Cir. 2010). A loose factual connection between the claims generally has been held sufficient to satisfy the second requirement.   *See* Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction, § 3567, pp. 445-47.   In this case, the Court recommends that the District Court find Plaintiff's allegations concerning the Sections 1981 and 1983 claims against DPS demonstrate sufficient substance to confer federal jurisdiction, and such claims and Plaintiff's promissory estoppel claim arise out of a common nucleus of operative fact.

Next, the Plaintiff must demonstrate that he alleges sufficient facts showing a plausible claim for promissory estoppel against DPS.  Under Colorado law, the elements of promissory estoppel are:

26

> (1) a promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee; (2) action or forbearance induced by that promise; and (3) the existence of circumstances such that injustice can be avoided only by enforcement of the promise.

*Nelson v. Elway*, 908 P.2d 102, 110 (Colo. 1995). In the employment context, "[a]n employee may be entitled to relief under a promissory estoppel theory if the employee can demonstrate that: the employer should reasonably have expected the employee to consider the employer's communication as a promise from the employer; the employee reasonably relied on the promise to his detriment; and injustice can be avoided only by enforcing the promise." *Watson v. Public Serv. Co. of Colo.*, 207 P.3d 860, 869 (Colo. App. 2008).

> Thus, in order to constitute an enforceable promise, a statement by the employer must meet two requirements. It must disclose a promissory intent or be one that the employee could reasonably conclude constituted a commitment by the employer. If it is merely a description of the employer's present policies, it is neither a promise nor a statement that can reasonably be relied upon. In addition, the employer's statement must be sufficiently definite to allow a court to understand the nature of the obligation undertaken.

*Hoyt v. Target Stores*, 981 P.2d 188, 194 (Colo. App. 1998). "Assurances of fair treatment or 'mere vague assurances' are unenforceable." *Id.* (citing *Vasey v. Martin Marietta Corp.*, 29 F.3d 1460, 1465 (10th Cir. 1994)).

Here, with respect to the first promise, it is undisputed that DPS's operations manual provides direction and/or instruction in the form of policies with which DPS expects its employees to conform and which may form "promises" for purposes of a promissory estoppel claim. Defendants argue, however, that taken as true, Plaintiff's allegations demonstrate that the Defendants did not breach the "false reporting" and "honesty" policies and, thus, Plaintiff cannot demonstrate resulting harm. The Court disagrees; Plaintiff's allegations in paragraphs 111 and 176 (cited by Defendants) do not lead the Court to conclude that Plaintiff's claim fails as a matter of law.

Rather, Plaintiff focuses on Paine's statement that "only supplemental reports could be completed," and without additional evidence placing the statement in context, the Court cannot determine that, as a matter of law, Paine violated no policies in the operations manual. Rather, this appears to be an issue of fact that must be considered by a factfinder.

With respect to the second and third promises, Defendants assert that Plaintiff has failed to allege the "revised guidelines" and "practice and protocol" were promises made by anyone with authority to bind DPS and, thus, the claims should be dismissed as a matter of law. Again, the Court disagrees. Plaintiff refers to such guidelines, practice and protocol as those implemented by the "Department" [of Safety and Security] at DPS; the Court finds these allegations to be sufficient to put DPS on notice of the claim against it. In addition, "[t]he U.S. Supreme Court has recognized that policy or custom can arise from practices not authorized by written law or express municipal policy." *Ness v. Glasscock*, 781 P.2d 137, 140 (Colo. App. 1989) (citing *Praprotnik*, 485 U.S. 112 (1988)).

Furthermore, the cases on which Defendants rely for their argument both involve motions for summary judgment that were analyzed by the district courts following the parties' discovery into whether the plaintiffs had produced evidence that an official of the municipality with authority had made the challenged promises. *See Sandoval v. City of Boulder*, 388 F.3d 1312, 1330 (10th Cir. 2004); *Holland v. Bd. of Cnty. Comm'rs*, 883 P.2d 500, 506 (Colo. App. 1994). Here, of course, the Court considers no evidence pursuant to Rule 12(b)(6) in determining whether the promissory estoppel claim should be dismissed and, thus, Defendants' cases are distinguishable.[8]

---

[8]The Court concludes that it should not, and need not, consider the documents attached to the motion and briefing for its analysis. *See Wheeler v. Hurdman*, 825 F.2d 257, 259 n.5 (10th Cir. 1987) (noting the "strict limitations under 12(b)(6) against considering matters outside the

Consequently, the Court finds Plaintiff's allegations concerning the first, second and third promises, allegedly made by DPS and on which he allegedly relied to his detriment, to be sufficient to withstand a motion to dismiss.  Accordingly, this Court recommends that the District Court deny Defendants' motion to dismiss Plaintiff's promissory estoppel claim against DPS.

## CONCLUSION

In sum, the Court finds the Plaintiff has sufficiently stated plausible claims against DPS for violations of 42 U.S.C. §§ 1981 and 1983 (fourth claim for relief) and for promissory estoppel (sixth claim for relief), but has failed to state plausible claims for violations of  42 U.S.C. §§ 1981 and 1983 against Defendants Wehrli, Conroy and Swain (fifth claim for relief).  Accordingly, the Court respectfully RECOMMENDS that the Motion to Dismiss Amended Complaint filed by Defendants School District No. 1, City and County of Denver ("DPS"), Robert Swain, Lisa Wehrli and Thomas Conroy [filed February 10, 2014; docket #29] be **GRANTED IN PART AND DENIED IN PART**, and that the District Court dismiss Plaintiff's fifth claim for relief against Swain, Wehrli and Conroy.

Respectfully submitted this 7th day of April, 2014, at Denver, Colorado.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge

---

complaint").

29