IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger

Civil Action No. 13-cv-02912-MSK-MEH

STANLEY CREWS,

      Plaintiff,

v.

CITY AND COUNTY OF DENVER SCHOOL DISTRICT NO. 1, also known as Denver
Public Schools;
CLIFFORD PAINE; and
MICHAEL EATON;

      Defendants.

---

**OPINON AND ORDER GRANTING IN PART AND DENYING IN PART
MOTION FOR SUMMARY JUDGMENT**

---

     **THIS MATTER** comes before the Court on the Defendants City and County of Denver

School District No. 1, Clifford Paine, and Michael Eaton's Motion for Summary Judgment

(**#75**), the Plaintiff Stanley Crew's Response[1] (**#86**) and Supplemental Response (**#101**), and the

Defendants' Reply (**#104**).

### I. Material Facts

---

[1]    When attaching exhibits in support of his motion, Mr. Crews aggregates several exhibits
into a single filing. *See e.g.* Docket # 86-1 (containing Exhibits E, F, and G). This is contrary to
the Court's Electronic Case Filing requirements, which require each individual exhibit to be a
separate attachment. *See* Electronic Case Filing Procedures (Civil), § 4.8(c) ("Each exhibit
referenced in a pleading, motion, brief . . . shall be submitted to ECF as a <u>separate</u> ECF
attachment") (emphasis added). Failure to comply with this policy in the future may result in a
striking of the offending motion or brief.

    Although the Defendants' motion does not commit the same sin in the same way, the
Court is compelled to observe that the attachment of numerous relevant documents to Sgt.
Paine's affidavit – essentially, exhibits to an exhibit – is also unhelpful, as it makes it difficult for
the Court to quickly locate a pertinent document referenced in briefing. The Court strongly
suggests that, in the future, the Defendants also file those exhibits as separate documents.

Having reviewed the record and submissions of the parties, the Court finds the following facts to be undisputed, or where there is a dispute, the facts are viewed in the light most favorable to the non-movant, Mr. Crews.

### A.  Background

Mr. Crews, a black man in his fifties, worked for the City and County of Denver School District No. 1 (Denver Public Schools, or the District) as an armed patrol officer in the Department of Safety and Security.  Mr. Crews was employed by the District from May 1995 until he was terminated in February 2012.  While Mr. Crews was employed, he was supervised by various Sergeants, who were in turn supervised by a Commander or Lieutenant, who was supervised by the Chief of the Department.  During the time period pertinent here, Mr. Crews worked the graveyard shift, generally alongside two other officers: John Linger, who is white, and Lawrence McFadden, who is black.

Mr. Crews' employment history with the District is somewhat mixed.  Although he received performance evaluations ranging from "effective" to "superior" between 2005 and 2010 (the record does not disclose earlier reviews), he also accumulated numerous disciplinary notices and warnings – as many as 12 during the period from 1998 to 2008, several of which involved Mr. Crews' failure to submit timely reports.

### B.  Mr. Crews' difficulties with Sgt. Paine

At the end of 2009, Clifford Paine was promoted to Sergeant and became Mr. Crews' direct supervisor. The record reflects that, to some extent, Sgt. Paine was more demanding and less tolerant than Mr. Crews' previous supervisors had been.  Mr. Crews alleges that Sgt. Paine subjected him to increased scrutiny, different departmental policies and work rules, and false allegations of misconduct.  For example, Mr. Crews states that, upon arriving at work, Mr.

2

Crews would "meet me at the door looking at his watch then proceed to follow me around criticizing what I was doing."  Sgt. Paine accused Mr. Crews of an incident of spitting on a police car, although Mr. Crews denies having done so.  Sgt. Paine required Mr. Crews to produce a doctor's note the day following a medical absence, when "the standard and protocol had always been" that employees could take up to 5 days to produce a note.  Sgt. Paine would often schedule Mr. Crews as the only officer on the graveyard shift when "department policy" required two and he would not follow the custom of Sergeants filling in for patrol officers who were on vacation or sick leave.  With regard to these events, Mr. Crews does not expressly indicate whether Sgt. Paine directed these actions solely at him, or whether Sgt. Paine subjected other officers (particularly Mr. Linger) to the same treatment, although Sgt. Paine's own deposition testimony indicates that he specifically identified Mr. Crews and Mr. McFadden, the two black employees on the graveyard shift, as ones that were the most resistant to change.

One of Sgt. Paine's pet peeves involved incident reports filed by officers.  After each occasion in which an officer is called out to respond to an incident or alarm, the officer  is required to complete a report.[2]  The officer in charge on the call typically completes the "primary report," and other officers assisting on the call complete "supplemental reports."  As of at least 2008, District policy required that officers complete and submit their reports by the end of their shift on the day of the event.  An exception existed that allowed officers to file reports until the day after they were otherwise due, if: (i) the report was not considered "essential" or "sensitive," (ii) completing the report on time would require the officer to incur overtime, and (iii) the officer informed his supervisor of the situation beforehand.  This policy was reaffirmed by the District in March 2009, through what is referred to as a "Commander's Directive."  There is some

---

[2]      Reports are completed on a computer located in the officer's car and submitted wirelessly to the District's computer system.

ambiguity in the record as to whether supplemental reports are governed by this same policy: the policy language itself does not differentiate between primary and supplemental reports, but Mr. Crews states in his affidavit that, as a matter of general practice in the District, supplemental reports could be turned in on the day following the incident.

Sgt. Paine and Mr. Crews had particular friction regarding reports.  Mr. Crews states that Sgt. Paine "would find issues or demand corrections to reports that had been done [in] the standard practice" that had prevailed previously.  This does not seem to be a practice that was unique to Mr. Crews, as Mr. Linger testified that getting a report returned to him for corrections was "very not unusual, that happens all the time."  (Mr. Crews complains that, frequently, Sgt. Paine would "not state what needed to be corrected," and asserts that Mr. McFadden complained of the same problems.[3])  Mr. Crews also experienced certain difficulties with having Sgt. Paine acknowledge his reports.  He contends that Sgt. Paine "would hold my reports that had been timely submitted in a folder for approval," wait until after the reports were due, and then "send me e-mails that my reports were late."  He also alleges that "many of the reports I turned in were deleted" by unknown persons or circumstances.  (Sgt. Paine's affidavit notes that Mr. Linger has also complained that reports he had completed and turned in were reported as missing.)  At some point in time, Sgt. Paine directed that Mr. Crews respond to e-mails with "read receipts" verifying that he had seen them.  Sgt. Paine asserts that he "required other officers, including Caucasian officers, to respond to e-mails with read receipts."

On May 19, 2011, Sgt. Paine issued a disciplinary Letter of Warning to Mr. Crews.  That letter referenced an incident on May 10, 2011, in which Sgt. Paine had returned a report to Mr.

---

[3]     Mr. Crews has not submitted an affidavit or deposition testimony from Mr. McFadden. As such, his assertions about what Mr. McFadden told him are hearsay and not properly before the Court.   *Adams v. American Guarantee and Liability Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).

Crews for corrections.  The letter recited that on May 12, 2011, the report had not been returned and Sgt. Paine directed Mr. Crews via e-mail that the report be completed by May 16, 2011, the date that Mr. Crews returned to duty from a leave.  On May 18, 2011, Sgt. Paine still had not received the report, and thus issued the Letter of Warning to Mr. Crews for violation of "Policy 2.40," a rule that requires employees to "read and understand Departmental Regulations, Standard Operating Procedures, electronic information, [and] training bulletins."

Mr. Crews contends that this discipline was unfounded, as he had "timely electronically submitted the corrected report to Paine in his reports approval folder as he requested."  Mr. Crews points to several instances in which other officers (including himself) were notified by another Sergeant, Lisa Wehrli, of reports that they were responsible for that were "missing" and were instructed to complete the reports promptly.  Mr. Crews notes that none of the other individuals notified by Sgt. Wehrli were disciplined for the missing reports.  (The District suggests, albeit without supporting evidence, that these employees were not disciplined because they promptly complied with Sgt. Wehrli's instructions, unlike Mr. Crews' failure to promptly respond to Sgt. Paine's.)

Prompted by the May 2011 Letter of Warning, Mr. Crews contacted an attorney and on May 26, 2011, the attorney wrote to the District presenting Mr. Crews' position with regard to the Letter of Warning.  Mr. Crews' attorney's letter insisted that "Mr. Crews seems to be singled out and treated differently than all other security personnel."  Although the letter did not expressly posit that this was due to Mr. Crews' race or age, it did allege that the conduct "appear to constitute a pattern of harassment and discrimination against Mr. Crews."

In the meantime, on May 23, 2011, Sgt. Paine[4] placed Mr. Crews on a "Plan for Improvement" ("PFI") that required him to send a daily e-mail to Sgt. Paine and Sgt. Wehrli to confirm that he was reading and responding to his e-mails.  On occasions in May and June 2011, Sgt. Paine reprimanded Mr. Crews for failing to comply with the PFI.

At or about this time, Mr. Crews complained about Sgt. Paine's conduct to Commander Robert Swain.  Mr. Crews told Commander Swain that he thought Sgt. Paine was trying to create a paper trail to support his termination. Commander Swain notified Sgt. Paine of Mr. Crews' complaints, but he did not otherwise investigate.  On June 16, 2011, Mr. Crews contacted Human Resources and indicated that he wanted to file a grievance.  He later met with a representative from Human Resources to discuss his concerns.  The District's outside counsel began investigating Mr. Crews' complaints.

On June 28, 2011, Sgt. Paine prepared a "Supervisor Insight" report, recommending that Mr. Crews be terminated for failing to provide a doctor's release for time off.  The report indicated that Mr. Crews had demonstrated a pattern of non-compliance with policies and noted 20 incidents that occurred over an 11-month period.  However, Sgt. Paine never presented the report to Commander Swain for further action because the District's counsel had begun investigating the allegations in Mr. Crews' attorney's letter and instructed Sgt. Paine to refrain from taking further action until that investigation was completed. According to Sgt. Paine, he honored counsel's instructions and continued "business as usual."

In June 2011, Michael Eaton replaced Chief Ed Ray as the Department Chief.  Chief Eaton and Mr. Crews met in July 2011.  Mr. Crews complained that in the past, black patrol officers had been harassed and weren't notified when field training positions opened up.  Eaton

---

[4]     Sgt. Paine's affidavit asserts that it was Chief Ed Ray who placed Mr. Crews on the PFI. The document in the record contains only Sgt. Paine's signature.

explained that he did not have any knowledge of what had happened in the past, but from this point forward harassment would not be tolerated.

### C. Mr. Crews' termination

At approximately 1:00 AM on January 24, 2012, Mr. Crews was dispatched as the to respond to a burglary in progress at Wyman Elementary School.  Another officer, Alix Two-Elk, was also dispatched.  At the time, Officer Two-Elk had been a patrol officer with the District for approximately three months.  It appears that the dispatcher determines which officer will be primarily responsible for the matter, and the dispatcher identified Mr. Crews as the primary officer.[5]

Officer Two-Elk arrived first on the scene, followed by Mr. Crews several minutes later. Mr. Crews and Officer Two-Elk entered the building to assess the damage, which included a broken window.  Officer Two-Elk contacted the dispatcher and informed him of the damage. Officer Two-Elk was told that the District's point of contact person and glass repair person would not arrive until the morning.  Officer Two-Elk stayed on the scene to monitor the broken window and protect the premises.  Mr. Crews notified dispatch that he would be handling patrol. Mr. Crews left the scene around 2:45 AM to respond to another call.

Because Mr. Crews had to leave the Wyman scene, Officer Two-Elk and Mr. Crews agreed that Officer Two-Elk would write the primary incident report.  Officer Two-Elk initially submitted his report as a "supplemental" report because that was the only report type he could access in the system due to being designated as the back-up officer, not the primary officer, by the dispatcher.  Officer Two-Elk's report was submitted at 5:27 AM.  Mr. Crews did not submit

---

[5]     Mr. Linger's deposition testimony suggests that, whatever formal policy existed for identifying the primary officer responsible for a call, the informal practice among officers was that the first officer to arrive on the scene was typically the one who would file the primary report.

his report during his shift on January 24th, nor did he contact a supervisor to obtain permission to withhold filing his report until the next shift.

After the Wyman incident, Sgt. Paine and Sgt. Wherli met with Mr. Crews and asked him why he failed to timely file his report. Mr. Crews explained that he was unable to access the reporting system to complete the supplemental report. After receiving additional instruction from Sgt. Wherli, Mr. Crews was able to complete his report. Later, Sgt. Paine changed the officers' designations in the reporting system to reflect that Officer Two-Elk was the primary officer and Mr. Crews was the back-up officer so that each officer could file the proper report. Sgt. Paine instructed Officer Two-Elk to "copy and paste" his original supplemental report onto the primary report. Sgt. Paine was concerned, however, because officers had been directed to contact a supervisor if they were having problems accessing the system, which Mr. Crews did not do.

On January 25, 2012, Sgt. Paine completed another Supervisor Insight report in which he recommended that Mr. Crews be terminated. In the report, Sgt. Paine accused Mr. Crews of several policy violations. First, he asserted that Mr. Crews violated Policy 2.11, which requires that in the event several officers respond to a scene, the senior officer shall assume command and direction of personnel until a higher-ranking officer arrives or until the officer is relieved of duty. Sgt. Paine determined that Mr. Crews was the senior officer during the Wyman incident and that he left the scene without being properly relieved of his duties.

Second, Sgt. Paine also concluded that Mr. Crews violated Policy 2.56, which requires officers to submit necessary reports by the end of their shift except with supervisor approval. Sgt. Paine determined that Mr. Crews failed to timely submit his supplemental report and failed to obtain supervisor approval to hold the report. Sgt. Paine acknowledged Mr. Crews'

explanation that he could not submit the report because he could not connect to the network, but found the explanation to be incredible because the system records indicated that Mr. Crews had indeed logged on to the network when he started his shift on the evening of January 24th.  Sgt. Paine concluded that even if he credited Mr. Crews' explanation, Mr. Crews nevertheless failed to contact the on-call supervisor for assistance with the network or for approval to hold his report until a later time.

Third, Sgt. Paine concluded that Mr. Crews failed to comply with a Department directive that required the primary officer to notify a supervisor when serious incidents, like burglaries, occur.  Mr. Crews asserts that, as a matter of practice (if not necessarily one of policy), dispatchers were responsible for contacting the District's supervisor in such situations.  Mr. Crews also points to Sgt. Paine's own deposition testimony that dispatchers "should probably call the on-call supervisor to notify them we have an incident in progress."  (Sgt. Paine later testified that the primary officer "should call the on-call [supervisor], the officer responding to the scene when they get there to give us updates.")

Sgt. Paine's report was submitted to Commander Swain and then to Chief Eaton.   A few days later, Mr. Crews met with Chief Eaton, Commander Swain, Sgt. Wherli, and a representative from Human Resources.  Chief Eaton told Mr. Crews that he did not fit his vision of the department moving forward and offered him retirement paperwork.  Mr. Crews was 54 years old at the time.  Chief Eaton told him that if he chose not to retire, he would be terminated. Mr. Crews refused to retire.  Chief Eaton then issued him a termination letter, noting that Mr. Crews had violated Department Policies 2.11 and 2.56 and failed to follow supervisor directives during and after the Wyman incident.  Chief Eaton also noted several examples from Mr. Crews' disciplinary history, which showed a pattern of "substandard performance."  Chief Eaton's

decision to terminate Mr. Crews was based on the Sgt. Paine and Commander Swain's recommendations and a review of Mr. Crews' personnel file.

Pursuant to District policies, Mr. Crews requested and was granted a hearing regarding his termination. The hearing officer upheld the termination. Mr. Crews did not request a second hearing before an impartial third-party hearing officer.

After exhausting administrative remedies, Mr. Crews initiated this action. He asserts the following claims: (1) a claim against the District that his termination constituted discrimination on the basis of race in violation of Title VII, 42 U.S.C.§ 2000e-3(a); (2) a claim against all three Defendants, in that his termination constituted race discrimination in violation of 42 U.S.C. § 1981; (3) a claim against all three Defendants, in that his termination was racially-motivated and thus a violation of his 14th Amendment right to Equal Protection under 42 U.S.C. § 1983; (4) a claim against the District under Title VII for permitting a racially-hostile work environment; (5) a claim against the District for retaliatory termination in violation of Title VII; (6) a claim against the District, in that his termination was motivated by his age in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623(a)(1); and (7) promissory estoppel against the District arising from its failure to abide by promises made in its Security Operations Manual.

The Defendants seek summary judgment on all claims.

## II.  Standard of Review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Thus, the primary question presented to the Court on a motion for summary judgment is, is a trial required?

A trial is required if there are material factual disputes to resolve.  As a result, entry of summary judgment is authorized only "when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016).  A fact is material if, under the substantive law, it is essential to an element of the claim.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine if the conflicting evidence would enable a rational trier of fact to resolve the dispute for either party.  *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013).

The consideration of a summary judgment motion requires the Court to focus on the asserted claims and defenses, their legal elements, and which party has the burden of proof. Substantive law specifies the elements that must be proven for a given claim or defense, sets the standard of proof, and identifies the party with the burden of proof.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  As to the evidence offered on summary judgment, the Court views it the light most favorable to the non-moving party, thereby favoring the right to trial.  *See Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013).

Motions for summary judgment generally arise in one of two contexts — when the movant has the burden of proof and when the non-movant has the burden of proof.  Each context is handled differently.  When the movant has the burden of proof, the movant must come forward with sufficient, competent evidence to establish each element of its claim or defense.  *See* Fed. R. Civ. P. 56(c)(1)(A).  Presumably, in the absence of contrary evidence, this showing would entitle the movant to judgment as a matter of law.  However, if the responding party presents contrary evidence to establish a genuine dispute as to any material fact, a trial is required and the motion must be denied.  *See Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015); *Schneider v. City of*

*Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013).

A different circumstance arises when the movant does not have the burden of proof.  In this circumstance, the movant contends that the non-movant lacks sufficient evidence to establish a *prima facie* case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The moving party must identify why the respondent cannot make a *prima facie* showing — that is, why the evidence in the record shows that the respondent cannot establish a particular element.  *See Collins*, 809 F.3d at 1137.  If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, then a trial is required.  Conversely, if the respondent's evidence is inadequate to establish a *prima facie* claim or defense, then no factual determination of that claim or defense is required and summary may enter.  *See Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007).

## III.  Analysis

### A.  Race Discrimination Claims under Title VII and 42 U.S.C. §§ 1981 and 1983

In disparate treatment discrimination suits, the elements of a plaintiff's case are the same whether the case is brought under § 1981 or § 1983 or Title VII.  *See Carney v. City and Cnty. of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008).  The Court therefore considers all of Mr. Crews' race discrimination claims together.

To prevail on a claim alleging termination on the basis of race, a plaintiff must show, through either direct or indirect evidence, that the discrimination was intentional.  *See EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1191 (10th Cir. 2000).  Where, as here, there is no direct evidence of discrimination, the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies.  Mr. Crews must first establish a *prima facie* case, that (1) he was a member of a protected class; (2) he was qualified and satisfactorily

performing his job; and (3) he was terminated under circumstances giving rise to an inference of discrimination.  *See Salguero v. City of Clovis*, 36 F.3d 1168, 1175 (10th Cir. 2004).  If Mr. Crews meets his burden of establishing a *prima facie* case, the burden shifts to the Defendants to articulate a legitimate, nondiscriminatory reason for the termination.  *See id.*  If the Defendants satisfy their burden, the burden shifts back to Mr. Crews to provide evidence showing that the Defendants' proffered reasons are a pretext for racial discrimination.  *See id.*

The Defendants contend that Mr. Crews cannot prove a *prima facie* case because he cannot establish that he was terminated under circumstances giving rise to an inference of discrimination.  The Defendant also contends that Mr. Crews cannot establish that their proffered reasons for the termination are pretext for discrimination.

Turning first to the *prima facie* case, the Court pauses to note that the burden on an employee at this stage is "not onerous," *Horizon,* 220 F.3d at 1197, and has even been described as "*de minimis.*"  *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005).  To establish the requisite circumstances giving rise to an inference of discrimination, the employee may resort to a variety of mechanisms, showing "actions or remarks by decisionmakers that could be viewed as reflecting discriminatory animus, preferential treatment given to employees outside the protected class, . . .  the fact that the defendant, following plaintiff's termination, continued to seek applicants to fill the position, . . . or, more generally, upon the timing and sequence of events leading to plaintiff's termination."  *Plotke*, 405 F.3d at 1101.  Mr. Crews could also show that he was terminated and replaced in a job he was qualified for because it is facially illogical to randomly fire an otherwise qualified employee and thereby incur the considerable expense and loss of productivity associated with hiring and training a replacement.  *See Perry v. Woodward*, 199 F.3d 1126, 1140 (10th Cir. 1999).  Even this listing is non-exclusive, as "courts must be

sensitive to the myriad of ways such an inference can be created." *Hysten v. Burlington Northern & Santa Fe. Ry. Co.*, 296 F.3d 1177, 1181 (10th Cir. 2002).   Ultimately, the goal of the *prima facie* case is for the plaintiff to show "actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion." *Id.*

Initially, the Court has some concern as to Mr. Crews' ability to satisfy the elements of the *prima facie* case.  Certainly, there is evidence that Sgt. Paine did not think very highly of Mr. Crews as an employee and did not hesitate to seek to impose discipline on him.  But even if the Court assumes that Sgt. Paine actively disliked Mr. Crews, there remains the difficulty of determining <u>why</u> he disliked him: whether it was because of Mr. Crews' <u>race</u>, and not one of the much broader universe of <u>permissible</u> reasons to dislike him – *e.g.* because Sgt. Paine did not like Mr. Crews' work ethic, that he did not learn fast enough, that he did not strictly follow procedures, that he was too tall or not tall enough, etc.   As noted above, a sufficient *prima facie* case is one that permits the conclusion that, until the employer explains otherwise, it is <u>more likely than not</u> that the employer's actions were based on the employee's race, and merely showing that: (i) Sgt. Paine disliked Mr. Crews, and (ii) Mr. Crews is black, is simply not enough.[6]

Mr. Crews takes various approaches in attempting to tie Sgt. Paine's decision to racial animus, many of them unavailing.  He points to numerous racially-charged epithets that were used around the workplace (discussed below), but none of these were allegedly made by Sgt. Paine or are even incidents of which Sgt. Paine was arguably aware.  He points to various

---

[6]       As the Defendants note, there is a dispute as to whether Sgt. Paine's attitudes towards Mr. Crews matter at all, given that it was ostensibly Chief Eaton's decision to terminate him.  The Court addresses that issue later.

inconsistencies in the District's proffered reasons for his termination, but that puts the pretext cart before the *prima facie* case's horse. Although the 10th Circuit has sometimes acknowledged that pretext evidence can be considered when assessing whether the employee has established a *prima facie* case, *Wells v. Colo. Dept. of Transp.*, 325 F.3d 1205, 1218 (10th Cir. 2003), the court should do so with caution: "[b]y conflating evidence tending to cast doubt on the employer's stated reasons for an employment decision with the burden of establishing an inference of actionable discriminatory animus in the first instance, Plaintiffs seek to gain the benefit of that inference without having to establish it." *Adamson v. Multi Community Diversified Services, Inc.*, 514 F.3d 1136, 1144 (10th Cir. 2008). Thus, an employee hoping to prove his *prima facie* case by attacking the employer's reason for his termination must still show "a demonstrable nexus between aspersions cast on an employer's stated reasons and invidious intent." *Id.*

Ultimately, however, the Court concludes that Mr. Crews meets his *prima facie* burden – barely – by showing at least some colorable evidence that: (i) part of the justification for his termination was that he violated Policy 2.56, which governs reporting and requires that officers "shall without delay, and by the end of shift or assignment, submit all reports for administrative processing," by failing to promptly file his report on the Wyman incident; and (ii) that there is evidence that white officers, specifically, Mr. Linger, had failed to submit timely reports and was not disciplined as a result. Admittedly, this is somewhat of a stretch: a showing of favorable treatment to similarly-situated white employees requires a demonstration that they deal with the same supervisor, are subjected to the same standards governing performance evaluation and discipline, and have engaged in conduct of "comparable seriousness." *See McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2000). Although Mr. Linger was indeed subject to the same supervision of Sgt. Paine and the same work rules as Mr. Crews, the Court has some reservations

as to whether Mr. Linger's late reports – for which the record provides no details whatsoever[7] – are of the same seriousness as a report following a burglary, an event that both parties agree is "essential" under the Commander's Directive.  Nevertheless, honoring the requirement that the Court draw reasonable inferences in favor of Mr. Crews, the minimal burden placed on employees at the *prima facie* stage, the preference for resolution of doubtful issues via trial, and the record as a whole, the Court will assume that Mr. Linger's and Mr. Crews' failures are at least arguably comparable.  Moreover, there is some evidence that Sgt. Paine acknowledged that Mr. Crews and Mr. McFadden, the two black employees on the graveyard shift, were the ones that had the most difficulty in meeting his heightened expectations.  Under these circumstances, the Court finds that Mr. Crews has sufficiently demonstrated an inference that his termination may have been based, at least in part, on racial animus.[8]

The Court pauses here to acknowledge what has previously been alluded to indirectly: the District contends that the decision to terminate Mr. Crews was made not by Sgt. Paine, but rather, by Chief Eaton.  As the District notes, Mr. Crews points to no evidence whatsoever that Chief Eaton might have harbored some racial animus against him.  The Court will not belabor the issue, except to refer to the "cat's paw" doctrine: the notion that "a biased subordinate who lacked descisionmaking power used the formal decisiomaker as a dupe in a deliberate scheme to

---

[7]       In reply, the Defendants argue that Mr. Linger's failure to timely file reports is distinguishable from Mr. Crews' for various reasons.  Most notably, they contend that "the evidence is that when notified a report was missing, Linger immediately turned it in."  The portion of the record that they cite for this proposition concerns Mr. Linger making prompt corrections to reports when Sgt. Paine demanded them, not situations in which Mr. Linger had failed to file the report in the first place.  Moreover, the Court notes that the Defendants had the opportunity to bring clarity to the record in their reply by demonstrating the particular instances in which Mr. Linger's missing reports differed from Mr. Crews', and they did not do so.

[8]       This is, to be sure, a tentative reprieve for Mr. Crews.  Should the evidence adduced at trial not warrant the generous assumptions that the Court has extended him here, the Court will not hesitate to grant judgment as a matter of law under Fed. R. Civ. P. 50 to the District.

bring about an adverse employment action." *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 514-15 (10th Cir. 2015).  Assuming, for the moment, that Sgt. Paine harbored some racial animus against Mr. Crews, Mr. Crews must then show facts that would suggest that Chief Eaton allowed himself to be influenced by Sgt. Paine's bias.  Among the ways that an employee might show such influence is by showing that the nominal decisionmaker failed to independently investigate the alleged misconduct, such as by failing to even ask the employee for his own version of the events.  *Id.* at 516-17.  Chief Eaton's affidavit indicates that he received Sgt. Paine's report of the Wyman incident, that he reviewed Mr. Crews' disciplinary history, and then decided to approve of Mr. Crews' termination.  Although Chief Eaton met with Mr. Crews, it appears that he did so only to inform him that he was being terminated.   As far as the record reflects, Chief Eaton did not independently interview Mr. Crews about the events, did not interview any other witnesses (*e.g.* Mr. Two-Elk or the dispatcher involved), and otherwise did not take any actions that would dispel the effect of any animus that may have been injected into the process by Sgt. Paine.  Thus, the mere fact that Chief Eaton was the nominal decisiomaker does not necessarily prevent Mr. Crews from establishing a *prima facie* case based on Sgt. Paine's actions.

The Court then turns to the pretext stage.  As has already been noted, the District justifies Mr. Crews' termination based on various alleged policy violations in his handling of the Wyman incident.  To demonstrate pretext, Mr. Crews must come forward with evidence of inconsistencies, weaknesses, implausibilities, or other defects in the District's justification. *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1234 (10th Cir. 2015).  In appropriate circumstances, such a showing, coupled with the inference derived from the *prima facie* case, may be sufficient to raise a genuine issue as to the ultimate question of discrimination.

An extended discussion of pretext is not necessary.  It is sufficient to observe that there is some evidence that many of the grounds cited by the District for terminating Mr. Crews are contrary to what appears to have been accepted practices in the District.  For example, although the District sanctions Mr. Crews for being the primary officer on the case but not contacting the on-call supervisor, Mr. Crews has come forward with evidence that, at least in practice, the District deemed the primary officer on the case to be the officer who arrived first (Mr. Two-Elk), rather than the officer designated by the dispatcher, and further, that officers customarily relied upon the dispatcher to make contact with the on-call supervisor.  Both Mr. Linger and Mr. Two-Elk have given testimony that confirms that these were the general practices observed by officers, notwithstanding the District's references to formal policies. Moreover, the District appears to have acknowledged that the dispatcher's designation of Mr. Crews as the primary officer was non-binding, as Sgt. Paine ultimately permitted Mr. Two-Elk, not Mr. Crews, to author the primary report on the Wyman incident.  An employee who shows that the employer acts contrary to an unwritten policy or company practice when making the decision to terminate has carried his burden of establishing a genuine dispute as to whether the employer's reason is pretextual.  *Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1230 (10th Cir. 2000).  Mr. Crews has done so here.

Accordingly, the Court denies the Defendants' motion for summary judgment on Mr. Crews' race discrimination claims.

### B.  Hostile Work Environment under Title VII

Mr. Crews contends that he was subjected to a hostile work environment because of his race.  To establish a hostile work environment claim, Mr. Crews must show that (1) he is a member of a protected group; (2) he was subject to unwelcome harassment, intimidation, or

ridicule; (3) the such harassment was based on his race; (4) that the harassment was severe and pervasive, in both an objective and subjective sense, and (5) the harassment had the effect of altering a term, condition, or privilege of his employment and created an abusive working environment. *Lounds*, 812 F.3d at 1222.

Title VII is not a "general civility code" and a plaintiff may not predicate a hostile work environment claim on the "run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces." *Id.*  Similarly, a plaintiff must show more than a "few isolated incidents of racial enmity." *See Will v. Roadway Express*, 136 F.3d 1424, 1432 (10th Cir. 1998).  Instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments. *See Chavez c. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005).  Moreover, it is important to recognize that the severity and pervasiveness evaluation is inherently fact dependent — there is not, and cannot, be a precise test for this determination.  Instead, the determination is made by looking at the totality of the circumstances. *See Lounds* 812 F.3d at 1222.  Courts consider a variety of factors, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *See id.*

The District contends that Mr. Crews cannot establish that he was subjected to harassment because of his race or that the harassment altered the conditions of his employment. In response, Mr. Crews argues that his evidence of a hostile work environment includes both overtly racial and derogatory comments and facially neutral conduct that occurred from 1998 through the time he was terminated in 2012.  Mr. Crews relies on the following comments, which he personally heard:

- Mr. Crews was called a "spook" by Mike French, of unknown rank, during a training exercise at an unidentified time.

- Mr. Crews overheard Chief Ed Ray call a school board member a "nigger" after a School Board meeting on an unidentified date.

- In 1999, Mr. Crews overheard Lt. Mark Wright say "I will be out with four Hispanics in a welfare low-rider."[9]

- From 1999-2000, Mr. Crews frequently heard Officer James Farmer call African American men "boys" and Hispanic men "spics."

- Al Elio, a person whose affiliation with the District is unknown, would say to Mr. Crews, "How you boys doing tonight?"  The record does not reflect when these comments took place.

- Sgt. Tome Cole described Mr. Crews to a new patrol officer as "the scum of DPS" in or about 2000.

In addition to these instances, Mr. Crews identifies certain instances in which co-workers or others allegedly made racially-offensive comments outside of Mr. Crews' presence.[10]  With

---

[9]     The Court assumes, without necessarily finding, that co-workers' use of specific racial slurs directed at Hispanics could nevertheless bolster a claim by Mr. Crews that he experienced a racially-hostile working environment, even though he is not Hispanic.

[10]     A hostile work environment may be stated by an individual who was not personally the subject of racial harassment, so long as he was made aware (directly or indirectly) of such harassment being directed at others.  *See Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 959 (10th Cir. 2012).

    However, instances in which Mr. Crews learned of racially-charged remarks by others through a third party raise hearsay concerns.  In the situation where Mr. Crews points to Officer X telling him that Officer X overheard Officer Y say "Z," Mr. Crews is relying on statements by a witness (X), made outside of open court, offered for the truth of the matter asserted ("I heard Y say Z" in order to establish that Y did indeed say Z).  Mr. Crews does not present these facts through the affidavit of the third party and thus, these statements are not properly-supported for

regard to some remarks, Mr. Crews sometimes indicates that he was told of the remark by persons who had heard it; as to certain other remarks, Mr. Crews simply asserts that the remark was made without ever indicating when or under what circumstances he learned of it.

- Lt. Wright referred to an otherwise unidentified individual named Jim Williams as "boy," and made statements such as "you are too old of a boy to be in this kind of work." Mr. Crews does not indicate whether he was present to hear these statements or, if not, how he came to learn of them.

- Officer James Farmer referred to black children as "porch monkeys." This remark was made to Officer Brian Wilson who was patrolling with him. Officer Wilson told Mr. Crews about the comment. The record does not indicate when this occurred.

- Lt. Wright referred to an individual named Ray Juan as a "spic" and a "wet-back." The record does not indicate how Mr. Crews became aware of the remark, but mentions that Mr. Crews and Mr. Wilson discussed it. The record does not indicate when this took place.

- Officer Mike Hicks reported to Mr. Crews that Carl Mueller (presumably a District officer) stated to a black parent "Get back you nappy-headed ho" while attempting to arrest the parent's son. This event occurred in or about 2008.

---

summary judgment purposes. *Adams v. American Guarantee and Liability Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).

In addition to these comments, Mr. Crews also asserts that as part of a mandatory training in 1998, he was forced to watch the movie "Dead Homies," which he describes in conclusory terms as "racially charged, offensive, and derogatory," without further elaboration.[11]

The Court finds that the evidence Mr. Crews has submitted does establish that the harassment rose to a level of an objectively-severe hostile work environment.  Mr. Crews provides so little context with regard to each of the comments, making it somewhat difficult for the Court to conclude that some of them amount to intimidation, ridicule, or insult at all – for example, whether the question "how you boys doing tonight" or the reference to Mr. Crews as "the scum of DPS" would be considered offensive by a reasonable black officer is necessarily bound up in context, such as the identity of the person making the statement, the composition of the audience, tone of voice, and other factors.  Mr. Crews offers no additional explanation or elaboration on the context of these remarks.  In such circumstances, the Court cannot say that these remarks would contribute to a hostile environment claim.

But assuming they are for purposes of this opinion, the Court finds that the various harassing comments, although certainly offensive and inappropriate, were not sufficiently severe or pervasive to warrant proceeding to trial.  At best, Mr. Crews has identified approximately 11 instances of offensive language or conduct, of varying degrees of severity, spread over a period of more than 12 years.  Most of the comments that have an ascertainable date are ones which occurred near the beginning of that period, sometimes more than a decade ago.  Admittedly, Chief Ray's use of the word "nigger" is troubling, and there can be no debate that the use of the

---

[11]    Mr. Crews also cites to numerous instances in which other employees either resigned or filed grievances based on alleged discrimination against them.  The reasons given by these employees for their resignations or grievances are also hearsay that is not properly before the Court simply on Mr. Crews' say-so.

word is inherently insulting and offensive, but the record reflects that the work was used on only one occasion, was directed at someone other than Mr. Crews, and that Chief Ray is not alleged to have played any other role in the adverse events that befell Mr. Crews.  In such circumstances, the Court finds that Mr. Crews' evidence is insufficient to establish a "steady barrage of opprobrious racial comments."  *Chavez*, 397 F.3d at 832; *see also Forman v. Western Freightways, LLC*, 958 F.Supp.2d 1270, 1277 (D.Colo. 2013) (finding that two instances of supervisor reportedly using the word "nigger" outside the employee's presence and a reference to employee as a "black cowboy" over a period of more than three years did not rise to level of an objectively-severe hostile environment).

Mr. Crews also argues that facially-neutral abusive conduct, such as that of Sgt. Paine, further supports his claim.   Evidence of facially-neutral abusive conduct can support a finding of animus when viewed in the context of other overtly discriminatory conduct.  *See Hernandez*, 684 F.3d at 960.  However, the Court is not convinced that the comments cites above and the treatment Mr. Crews received from Sgt. Paine can suitably be combined into a single "environment."  The comments are sporadic, sometimes vague, and so bereft of context that it is difficult to appreciate how, if at all, they fit within the world of Mr. Crews' employment.  None of the comments connect, directly or indirectly, temporally or otherwise, to the persons involved in the issues with Sgt. Paine, namely Sgts. Paine and Wehrli, Chief Eaton, and Commander Swain.  Moreover, as the Court has already noted, Mr. Crews' complaints about Sgt. Paine's treatment of him as being racially-motivated hang from a slender thread, and that thread cannot be extended to knit together the motley collection of comments that Mr. Crews seeks to present

as a unitary hostile environment. Accordingly, the District is entitled to summary judgment on Mr. Crews' hostile environment claim.[12]

### C. Retaliation under Title VII

Title VII forbids retaliation against an employee because he has opposed any practice made unlawful by Title VII. 42 U.S.C. § 2000e-3(a). As in race discrimination claims, where there is no direct evidence of retaliation, the claim is analyzed under the *McDonnell Douglas* burden-shifting framework. *Somoza v. University of Denver*, 513 F.3d 1206, 1211 (10th Cir. 2008). To establish a *prima facie* case of retaliation, Mr. Crews must show that (1) he engaged in protected opposition to discrimination, (2) he suffered an adverse employment action, and (3) a causal connection existed between the protected activity and the adverse employment action. *See id.* If Mr. Crews succeeds in proving a *prima facie* case, the District must provide a legitimate and facially non-retaliatory reason for its decision. If the District satisfies its burden, Mr. Crews must establish that the District's reasons were a pretext for retaliation. *See id.*

Mr. Crews alleges that he was terminated in retaliation for the complaints of discrimination he made in June 2011.[13] The District contends that Mr. Crews cannot establish a

---

[12]     Even if the Court were to conclude that Mr. Crews could establish a hostile work environment, the District raises the *Faragher/Ellerth* affirmative defense, arguing that Mr. Crews did not complete the grievance process that the District had in place. Viewing the evidence in the light most favorable to Mr. Crews, a factfinder could find that his complaint in 2011 at least put the District on notice that he believed he was being racially-harassed. But the record also shows that the District undertook an investigation of Mr. Crews' complaints through outside counsel. Mr. Crews does not allege that harassment continued after the District undertook the investigation. Because it would appear that the District acted reasonably in response to its notice of Mr. Crews' complaint, it is far from clear how Mr. Crews could hold the District liable for the harassment he contends occurred before 2011. *See Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1265 (10th Cir. 1998).

[13]     Without elaboration, Mr. Crews states that he also "complained of discrimination to Chief Eaton in January 2012 after he was selected for his third random drug test." But he provides no evidence as to who was the responsible party or what conduct was complained of.

*prima facie* case because he cannot prove a causal connection between his protected activity and his termination.  The District also contends that Mr. Crews cannot prove that its proffered reasons for his termination are pretext for retaliation.

A plaintiff establishes a causal connection between protected activity and an adverse employment action by proffering evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.  *See Stover v. Martinez*, 382 F.3d 1064, 1071 (10th Cir. 2004).  But if the adverse action occurs three months out and beyond from the protected activity, then the action's timing alone will not be sufficient to establish the causation element.  *See Conroy v. Vilsack*, 707 F.3d 1163, 1181 (10th Cir. 2013).  Here, Mr. Crews was terminated in January 2012, over seven months after he complained about discrimination.  The termination was plainly beyond the three-month mark and thus, the timing, by itself, is too temporally remote to support an inference of causation.  *See Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1182 (10th Cir. 2006).

Mr. Crews argues, however, that a causal connection exists because Sgt. Paine first intended to terminate him in June 2011, only 12 days after he made his complaint.  Relying on *Wells*, 325 F.3d at 1217, Mr. Crews argues that the only reason Sgt. Paine did not follow through with the termination was because he was stopped by counsel, and therefore a jury could find that Sgt. Paine had to wait until his first opportunity to do so in January 2012.

---

Assuming that his complaint could be considered protected activity, he provides no evidence that Sgt. Paine knew of the complaint.  Because Sgt. Paine was the supervisor who recommended termination, a causal connection cannot be established without evidence that Sgt. Paine was aware of the complaint.  Further, the record shows that Chief Eaton was sympathetic to Mr. Crews' frustration at being repeatedly selected for drug testing and he implemented measures to correct the situation.  The Court therefore finds that Mr. Crews cannot base his retaliation claim on a complaint he made to Chief Eaton in January 2012.

In *Wells*, the plaintiff made a complaint of gender discrimination in November 1995. Two days later, she went on medical leave.  She returned to work in April 1996.  Seven days after she returned she was transferred and reassigned to another project.  The Tenth Circuit held that although a five-month gap between protected activity and an adverse action would ordinarily be too great to support an inference of causation, the unique circumstances of the case permitted the inference.  Because the plaintiff was on leave during most of the time between the filing of her complaint and her transfer, the employer could not act on a desire to retaliate until the plaintiff returned to work.  *See id*. at 1217.

The Court has some doubt that *Wells* is applicable here.  There, the employer could not retaliate because it was not practical to do so until the plaintiff returned from leave.  Here, on the other hand, Mr. Crews was not on leave.  If Sgt. Paine truly wanted to retaliate against Mr. Crews, he would have done so much sooner than January 2012.  Further, Mr. Crews' argument ignores the reasoning behind the temporal proximity doctrine.  The law recognizes a causal inference from an adverse action shortly following protected activity because such action typically is the product of anger or resentment toward the complaining party.  *See Conroy*, 707 F.3d at 1182.  But the ability to draw that inference diminishes over time because we reasonably expect the anger or resentment to cool as time goes on.  *See id.*  Thus, the temporal period is measured from the date of the protected activity to the date of the adverse action, because this allows an accurate assessment of whether the employer's action likely was motivated by the protected activity.  *See id.*  To credit Mr. Crews' argument, one would have to assume that Sgt. Paine harbored negative feelings about Mr. Crews' complaints for over seven months.  This stands at odds with the temporal proximity rationale.

Nevertheless, there is some inherent persuasiveness to the notion that Sgt. Paine's decision to seek Mr. Crews' termination in 2011 was especially close in time to Mr. Crews' complaint of discrimination, which suggests a retaliatory intent by Sgt. Paine. The circumstances that caused Sgt. Paine not to pursue the termination were not that he suddenly had a change of heart and repented his alleged improper motivations; it was that his hand was stayed by direction of counsel. It is not implausible to assume that in such circumstances, Sgt. Paine chose to bide his time, nursing his retaliatory grudge, until such time as it could be expressed outside of the presumptive window of temporal proximity. Thus, the Court is not necessarily convinced that summary judgment should enter for the District on Mr. Crews' *prima facie* case. In any event, because Mr. Crews' race discrimination claims are proceeding to trial, and his retaliation claims turn on nearly all of the same evidence (particularly with regard to the District's proffered non-retaliatory reason for his termination), there is little trial efficiency that would be gained by an aggressive grant of summary judgment. Accordingly, the Court will allow Mr. Crews' retaliation claim to proceed.

### D. Age Discrimination under the ADEA

Under the Age Discrimination in Employment Act, it is unlawful for an employer to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age. 29 U.S.C. § 623(a)(1). As with race discrimination claims, where there is no direct evidence of age discrimination, the claim is analyzed under the *McDonnell Douglas* burden-shifting framework. *See Simmons v. Sykes Enters., Inc.*, 647 F.3d 943, 947 (10th Cir. 2011). To prove a *prima facie* case of age discrimination, Mr. Crews must show that (1) he is a member of the class protected by the ADEA; (2) he suffered an adverse employment action; an (3) the action occurred under

circumstance giving rise to an inference of discrimination. *See Bennett v. Windstream Commc'ns., Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015). If Mr. Crews carries his burden, the burden shifts to the District to provide a legitimate, nondiscriminatory reason for its conduct. If the District does so, the burden shifts back to Mr. Crews to demonstrate that the proffered reason is pretext for discrimination. *See id.* An ADEA plaintiff must ultimately establish that age was the "but-for" cause of the employer's decision. *See Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 176 (2009). The evidence of but-for causation must be based on more than mere speculation, conjecture, or surmise. *See Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014).

The District contends that Mr. Crews cannot establish a *prima facie* case because he cannot prove that the termination occurred under circumstances giving rise to an inference of discrimination. It also contends that Mr. Crews cannot establish pretext.

To establish a *prima facie* case, Mr. Crews relies only on the fact that during the termination meeting, he was told by Chief Eaton that he didn't fit the vision of the department, and he was offered an opportunity to retire rather than be terminated. The Court finds this evidence insufficient to establish an inference that Mr. Crews was terminated because of his age. Chief Eaton's comment does exhibit any ageist animus. Certainly, the "vision" statement made by Chief Eaton could, in some circumstances, be evidence of a concealed discriminatory motivation. But to sufficiently attribute an improper motivation to these facially-neutral statements, Mr. Crews must do something more than simply assert the statement itself; he must show other circumstances that suggest that Chief Eaton meant something other than the statement's ordinary meaning. He does not point to other comments by Chief Eaton that suggest an age-based bias or otherwise demonstrate a basis to infer discriminatory intent from that statement. Accordingly, the Court cannot treat the statement as having any meaning other than

its plain one: the District had a vision for the department, and Mr. Crews did not fit in it.  This is insufficient to demonstrate circumstances permitting an inference of age discrimination.

Similarly, the District's offer of retirement does not suggest that the termination would not have occurred but-for Mr. Crews' age.  Instead, all it shows is that the District had the ability to offer Mr. Crews the opportunity to depart on more amicable terms.

Because Mr. Crews has not established a *prima facie* case of age discrimination, the District is entitled to judgment in its favor on Mr. Crews' claim under the ADEA.

### E.  Promissory Estoppel

The contours of Mr. Crews' promissory estoppel claim remain somewhat opaque.  As best the Court can determine, Mr. Crews alleges that the District's Operations Manual (and the Commander's Directive which invokes the Manual) refers to a policy that prohibits employees from making "any . . . false accusation, that they believe to be untrue or unsubstantiated."  Mr. Crews construes this policy as a "promise" that prohibited Sgt. Paine "from submitting false information or omitting critical information about the Wyman incident to Crews' detriment." Specifically, he complains that Sgt. Paine modified the dispatcher's report of the incident to reflect that Mr. Crews was the primary officer assigned to the call, not Mr. Two-Elk,[14] thereby violating the policy.

The Court grants summary judgment to the Defendants on this claim for several reasons. First, the Court is not necessarily convinced that, on the record herein, the Operations Manual contains anything that could be understood to be a "promise" upon which Mr. Crews could

---

[14]     The Court notes that this would be the second time that the dispatcher's notation was modified by Sgt. Paine, as the record reflects that he reported to Chief Eaton and others that "I corrected the initial report to reflect [Mr. Two-Elk] as the primary and removed [Mr. Crews] to back up in order to clean this case up."  This was apparently done for technical reasons, so as to allow Mr. Two-Elk's report of the incident to be entered as the primary report.

somehow rely.  Moreover, Mr. Crews does not meaningfully articulate what facts demonstrate his alleged "reliance" on such a promise.  Finally, Mr. Crews has not demonstrated facts that indicate that Sgt. Paine's conduct falls within the terms of the policy, as Mr. Crews has not shown that Sgt. Paine's modification of the dispatcher's note is a statement that Sgt. Paine subjectively believed to be untrue or unsubstantiated.  To the contrary, the undisputed record in this case indicates that Sgt. Paine believes that the primary officer on a call is the one designated by the dispatcher, and thus, his modification of the dispatcher's note to reflect the situation as it occurred on the night of the Wyman incident is entirely consistent with Sgt. Paine's understanding of the events.

### IV.  Conclusion

For the forgoing reasons, the Defendants' Motion for Summary Judgment (**#75**) is **GRANTED IN PART** and **DENIED IN PART**.  Judgment shall enter in favor of the Defendant on Mr. Crews' claims for a hostile working environment, age discrimination, and promissory estoppel.  The motion is denied with regard to Mr. Crews' claims for race discrimination and retaliation.  The parties shall begin preparation of a Proposed Pretrial Order reflecting the claims that will proceed to trial in accordance with the instructions at Docket # 21, and shall jointly contact chambers to set a Pretrial Conference.

Dated this 31st day of March, 2016.

**BY THE COURT:**

Marcia S. Krieger
Chief United States District Judge